# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 5625 | **DATE** | 6/19/2002 |
| **CASE TITLE** | U.S.A. ex rel. A.M. vs. Jerry Butler, et al. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
     ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Petitioner's petition for writ of habeas corpus is granted. Because Petitioner has already completed the sentence imposed by the trial court, the court invites the parties, on or before July 5, 2002, to submit suggestions for an appropriate remedy.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | 3 | **Document Number** |
|---|---|---|---|---|---|
| | No notices required. | | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | JUN 19 2002 | |
| | Notified counsel by telephone. | | | date docketed | 86 |
| | Docketing to mail notices. | | | docketing deputy initials | |
| | Mail AO 450 form. | | | 6/19/2002 | |
| | Copy to judge/magistrate judge. | | CLERK U.S. DISTRICT COURT | date mailed notice | |
| ETV | courtroom deputy's initials | 02 JUN 19 PM 1:58 | | ETV | |
| | | Date/time received in central Clerk's Office | | mailing deputy initials | |

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, ex rel., A.M., | ) ) ) | |
| Petitioner, | ) ) | |
| v. | ) ) | No. 98 C 5625 |
| JERRY BUTLER, Superintendent of the Illinois Youth Center, and the ATTORNEY GENERAL OF THE STATE OF ILLINOIS, | ) ) ) ) | Judge Rebecca R. Pallmeyer |
| Respondents. | ) | |

DOCKETED

JUN 19 2002

## MEMORANDUM OPINION AND ORDER

Petitioner A.M., then a minor, was adjudicated delinquent and sentenced to five years probation for the first degree murder of his 83-year-old neighbor, Anna Gilvis. Petitioner was ten years old at the time of Gilvis's murder on October 5, 1993. Although police questioned him on the day of the murder, it was nearly a year later, on September 2, 1994, when Chicago police detectives elicited a confession from Petitioner, then eleven years old, during an interrogation at the police station. Following a hearing in the Circuit Court of Cook County, Juvenile Division, Petitioner was adjudicated delinquent on October 6, 1994 and sentenced to five years probation. Petitioner appealed to the Illinois Appellate Court, First District, which affirmed the adjudication and sentence on November 18, 1996. On December 12, 1996, Petitioner petitioned for a rehearing, but the Appellate Court denied rehearing on May 29, 1997. The Illinois Supreme Court denied his petition for leave to appeal on October 1, 1997.

Petitioner filed the instant petition for writ of habeas corpus on September 9, 1998, raising five claims: (1) Petitioner's Fourth and Fourteenth Amendment rights were violated when police illegally detained him; (2) Petitioner's Fifth and Fourteenth Amendment rights were violated when the police coerced his confession and the trial court failed to hold a hearing on the voluntariness of the confession; (3) Petitioner was denied effective assistance of counsel because his attorney

failed to move to suppress his involuntary statements; (4) Petitioner was denied effective assistance of counsel because his attorney failed to move to quash his illegal arrest and to suppress statements that were the fruit of that arrest; and (5) the prosecution did not prove Petitioner guilty beyond a reasonable doubt and the adjudication is based on an unreasonable determination of the facts. Because Petitioner has proven his ineffective assistance claim, the petition is granted.

## FACTUAL BACKGROUND

### Findings of the Illinois Appellate Court[1]

The Illinois Appellate Court affirmed the juvenile court's decision on appeal, and the following is a summary of facts as described in the Appellate Court's decision. (*People v. A.M., a minor*, No. 1-95-0383, Order of the Illinois Appellate Court, 1st Dist., Nov. 18, 1996, at 1 (hereinafter, "Ill. App. Ct. Order"), Exhibit A to Respondent's Answer.)

Anna Gilvis was murdered in her home on October 5, 1993. Detective Guy Habiak was assigned to the Gilvis homicide investigation, and on the day of her death, he went to her first floor apartment at 7219 South California. (*Id.*) Habiak found the kitchen cabinets open, a knife on a chair in the kitchen, the refrigerator covered with large streaks of blood, a broken cane lying on the floor, and a purse with its contents spilled out on the floor. (*Id.*) Habiak testified that the victim's feet were protruding from the bathroom and her ankles were tied with some red rope-like material. (*Id.*) The cord from the kitchen phone was wrapped around her arm, and there were bloody pieces of her cane handle lying near her head. (*Id.* at 2-3.) Habiak observed a large quantity of blood on

---

[1] A federal court reviewing a petition for writ of habeas corpus under 28 U.S.C. §§ 2254 presumes the state court's factual findings are correct. 28 U.S.C. §§ 2254(e)(1); *see also Sumner v. Mata*, 449 U.S. 539, 547 (1981). A petitioner has the burden of establishing by convincing evidence that a state court's factual determinations are erroneous. *See U.S. ex rel Green v. Greer*, 667 F.2d 585, 589 n. 6 (7th Cir.1981).

the bathroom floor, wall, and toilet, and a butcher knife lying on top of the victim's body. (*Id.* at 3.) Habiak saw that the victim had sustained significant bruising on her face, that her throat had been slit, and that she had been brutally beaten. (*Id.*) The bedroom adjacent to the bathroom had been ransacked: empty drawers were thrown on the bed and their contents were spilled out onto the bed and floor. (*Id.*)

During the course of his investigation on October 5, Habiak went outside and spoke with Petitioner, who was standing with an adult female.[2] (*Id.*) Petitioner told Habiak that on the previous night at around 7 p.m., he saw a black male in the alley walking into the victim's backyard and that he told the man to go away. (*Id.*) Petitioner saw the man walk to the back door of the victim's apartment, and then heard a squeaking or pounding noise. (*Id.*) Petitioner explained further that at about 8 p.m. that same night, he saw the victim walking down the street carrying bags filled with bottles of soda. (*Id.*) Petitioner stated that he helped her carry the bags, but did not enter her apartment. (*Id.*) Ms. Gilvis thanked him for his help and he went home. (*Id.*)

On cross-examination, Habiak testified that there were no hanging plants in the victim's apartment on October 5, 1993.[3] (*Id.*) He observed pry marks on the ground level door. (*Id.*) The locks from this door were sent to the crime lab for analysis.[4] (*Id.*) Habiak also testified that the locks on the rear door had been "jimmied" and there were scratches on the bolts. (*Id.*) Although no fingerprints were recovered from the crime scene, a palm print was found about five feet up on

---

[2]     Petitioner was standing in his backyard, and Habiak stood in the victim's backyard, and they conversed over the fence. (Trial Transcript, at 142.) The identity of the female adult who was standing with Petitioner is not disclosed in the record.

[3]     Although the Appellate Court made note of the absence of hanging plants in the victim's apartment, it did not explain the relevance of that detail. In his testimony at trial, Cassidy explained that in Petitioner's last statement to him, during which he confessed to committing the murder, Petitioner claimed to have tied the victim with ropes he retrieved from hanging plants in the victim's living room. (Trial Transcript at 202.)

[4]     The record does not disclose what, if anything, the analysis of the door locks revealed.

3

a wall outside of the bathroom. (*Id.* at 4.) Habiak stated that a partial shoe print was recovered from the rear porch. (*Id.*) He interviewed several adults in the neighborhood during the investigation, and took palm prints and shoes from a number of them. (*Id.*) Habiak testified that no children's shoes or prints were taken.[5] (*Id.*)

Detective James Cassidy was assigned to the Gilvis murder investigation some time after it was underway. Cassidy first spoke to Petitioner on September 1, 1994 after he learned that Petitioner had seen a man in the victim's backyard before she was killed. (*Id.*) Cassidy testified at trial that the police had tried to locate Petitioner for an interview, but did not find him until September 1, 1994 because he had moved. (*Id.*) Late that morning, Cassidy went to Petitioner's home and asked Petitioner's mother if he could speak with Petitioner. (*Id.*) Cassidy and his partner spoke to Petitioner in their police car, which was parked in front of Petitioner's home. (*Id.*)

Cassidy testified at trial that, during the conversation in his police car, Petitioner implicated another neighbor, Nolan Coleman. (*Id.*) Specifically, Petitioner reported that on the day of the murder he had seen Coleman in the backyard by the garage with his three children. (*Id.*) Petitioner claimed Coleman asked him to watch the children while Coleman talked with two black males, one tall and the other short. (*Id.*) Petitioner said he overheard Coleman tell the two men that an elderly, white woman lived nearby, that she did not like black people, and that she had a lot of money. (*Id.*) Petitioner further told Cassidy and his partner that he heard Coleman tell the two men to break in and take the woman's money while he waited at the gate near the alley as a lookout. (*Id.*) Petitioner claimed he saw the two men then jump the fence and enter the victim's home through the back door, and heard Coleman shout that the alley was clear. (*Id.* at 5.) Petitioner then returned to his own apartment, but when he came out again, Cassidy told him to

---

[5]     The Appellate Court did not mention whether Habiak testified about the size of the palm or shoe prints found in the victim's apartment. Because Habiak testified that the police collected palm prints and shoes only from adults, however, the court infers that both the palm and shoe prints appeared to have been adult-sized.

4

stay away from the backyard if he knew what was good for him, so Petitioner went back inside his own apartment. (*Id.*)

Cassidy testified that after hearing Petitioner's account of the events, he obtained Petitioner's mother's permission to take Petitioner to Area One Violent Crimes to be interviewed by an Assistant State's Attorney (hereinafter, "A.S.A."). (*Id.*) During an interview with A.S.A. Steven M. Klaczynski, Petitioner recounted the same version of events he earlier told Cassidy and Cassidy's partner in the squad car. Following the interview, Cassidy drove Petitioner to his aunt's house where his mother was waiting for him. (*Id.*) Cassidy testified that on September 2, 1994, Judge Williams issued a first-degree murder arrest warrant for Coleman, who was subsequently arrested and interrogated extensively. (*Id.*) With the permission of Petitioner's mother, Cassidy's partner brought Petitioner back to Area One. (*Id.*) After Petitioner repeated the statement he had given the day before, Cassidy told him that Coleman was in custody and after being questioned for hours, had denied any involvement in the murder. (*Id.*) According to Cassidy, Petitioner responded by saying, "I want to tell you what really happened," and acknowledged that his previous statement was not true. (*Id.*)

Cassidy testified at trial that Petitioner next proceeded to describe a sequence of events quite different from his earlier accounts: this time, Petitioner said that he had actually seen Coleman enter the victim's home alone carrying a baseball bat, and had followed him inside. (*Id.*) Cassidy testified that Petitioner told him that he saw Coleman beat the victim with the baseball bat in the kitchen, drag her to the bathroom where he continued to beat her, and then stab her with a knife. (*Id.* at 5-6.) Petitioner also said that he thought Coleman took money from one of the bedrooms. (*Id.* at 6.) When Coleman realized Petitioner was in the victim's apartment watching him, Coleman told Petitioner to keep his mouth shut if he knew what was good for him. (*Id.*)

Cassidy recalled that he then told Petitioner that he had trouble believing him because he could not understand why Coleman would have let Petitioner go after he witnessed the murder.

5

(*Id.*) Cassidy testified at trial that he never raised his voice or cursed while speaking with Petitioner, and that he did not consider Petitioner a suspect during the interview. (*Id.*) Instead, Cassidy stated, he thought Petitioner was a cooperating witness, he did not accuse Petitioner of the murder, and he never told Petitioner that either he himself or God would forgive him. (*Id.*) According to Cassidy, after he expressed doubts about Petitioner's story, Petitioner again told him that he wanted to tell the truth, and then proceeded to describe yet another sequence of events. (*Id.*)

This time, Petitioner said that Coleman approached him and asked him to act as a lookout while Coleman went inside to rob the victim. (*Id.*) At some point after Coleman had entered the apartment, Petitioner claimed, he himself went inside and watched Coleman murder the victim and take her money. (*Id.*) Cassidy pointed out that Petitioner could not have been a lookout if he stood inside the apartment and watched Coleman murder and rob the victim. (*Id.*) Cassidy told Petitioner that he did not want an innocent man to go to jail for first degree murder, and warned that because Petitioner's statements were the basis for the charges against Coleman, Petitioner must tell the truth. (*Id.*)

Cassidy testified that, in response to this instruction, Petitioner started to cry and shake and said: "I hated her and I killed her. She called me a nigger almost every day." (*Id.*) According to Cassidy, this time Petitioner asserted that he entered the victim's apartment through her open back door by himself and saw her standing in the kitchen holding her cane. (*Id.*) Petitioner recounted that as he approached the victim, she struck at him once with her cane. (*Id.*) Cassidy testified that Petitioner told him that he pushed the victim down, picked up her cane, and struck her in the face with it four times. (*Id.* at 6-7.) Petitioner told Cassidy that the victim dragged herself to the bathroom and tried to close the door, but Petitioner forced his way in and hit her again with the cane.[6] (*Id.* at 7.) Petitioner said that he tied the victim up with ropes, and she screamed and tried

---

[6]     In Petitioner's Appellate Brief, he described the streak of the victim's blood on the
(continued...)

to stand up. (*Id.*) Petitioner claimed that he went to the kitchen, found a knife, returned to the bathroom, and stabbed the victim in the throat. (*Id.*) Cassidy testified that while Petitioner made this statement he did not ask any questions, but sat in shock "at the hatred he saw in [Petitioner's] words and actions." (*Id.*)

Upon hearing this latest statement, Cassidy left the interview room to tell A.S.A. Klaczynski what Petitioner said. (*Id.*) Cassidy testified that the police attempted to contact Petitioner's mother but were unsuccessful.[7] (*Id.*) He testified further that his partner brought Youth Officer Cory in at about 5 p.m., and shortly thereafter Cassidy, Cory, and A.S.A. Klaczynski returned to the interview room where Petitioner was waiting alone, apparently unrestrained. (*Id.*) Cassidy testified that at this time, A.S.A. Klaczynski advised Petitioner of his constitutional rights and Petitioner stated that he understood them. (*Id.*)

According to Cassidy, Petitioner then repeated his latest statement, adding the information that after stabbing the victim, he ran to his apartment to change his clothes because they were covered with blood. (*Id.*) Petitioner told the officer that he put the bloody clothes in a bag and put the bag in a dumpster in an alley near 73rd Street, but that he did not recall what he did with the knife. (*Id.*) Cassidy testified that Petitioner also explained that he went to the victim's home to kill her, not to rob her, and that he had implicated Coleman in the murder because Coleman had stolen money from his mother.[8] (*Id.*)

According to Cassidy's testimony at trial, Petitioner's mother, Janet Tims, arrived at Area

---

[6](...continued)
floor of her apartment as smooth, straight, and uninterrupted. (Petitioner's Appellate Brief, at 26, Exhibit B to Respondent's Answer.)

[7]     It is not clear from the record what efforts the police made to contact Petitioner's mother.

[8]     Petitioner did not tell the officers when Coleman allegedly stole money from his mother.

One at about 6 p.m., and, with Tims present, A.S.A. Klaczynski again advised Petitioner of his constitutional rights and both Petitioner and Tims stated that they understood these rights. (*Id.* at 7-8.) A.S.A. Klaczynski asked Petitioner to repeat what he had told them, and Petitioner said that he had not killed anybody. (*Id.* at 8.) Cassidy testified that Tims asked Petitioner if he told the detectives that he had killed someone, and he responded that he had in fact told them that he had killed the victim. (*Id.*) Tims asked Petitioner, "Well if you didn't do it, why did you tell them that?" (*Id.*) Petitioner answered, "I don't know, I just did." (*Id.*)

Petitioner, his mother, and A.S.A. Klaczynski spent the next hour talking, without Cassidy, in the interview room, after which A.S.A. Klaczynski informed Cassidy that Petitioner did not want to tell his mother the details of his earlier confession. (*Id.*) According to Cassidy, once Petitioner and his mother came out from the interview room, Cassidy himself told Petitioner to tell his mother what he had confessed to earlier, at which time Petitioner told Tims, "I hated her and I killed her." (*Id.*) Cassidy testified that Tims pressed him, asking "You didn't kill her, did you?" to which, according to Cassidy, Petitioner responded, "Yes I did. I hated her." (*Id.*) Cassidy claims that Petitioner and his mother went through this exchange five times. (*Id.*)

At trial, the parties stipulated to the medical examiner's report prepared by Dr. Mitra Kalelkar of the Cook County Medical Examiner's Office. (*Id.*) Dr. Kalelkar concluded in the report that the victim died between Saturday, October 2, 1993 and Tuesday, October 5, 1993. (*Id.*) Dr. Kalelkar's report identified the cause of death as an incised wound to the neck and blood trauma, and noted two wounds to the neck, of about three and five inches in length, that severed both carotid arteries. (*Id.*) The report stated further that multiple blunt force injuries to the head also contributed to the victim's death. (*Id.*)

The parties also stipulated that fingerprints were recovered from the crime scene, and that the only fingerprints suitable for comparison matched the victim's fingerprints. (*Id.*) The sole palm print found at the crime scene was suitable for comparison, but the parties stipulated that it was

8

not Petitioner's palm print. (*Id.* at 8-9.) The state rested its case.

Detective Habiak testified for the defense that he canvassed the area around the victim's residence, but did not check the dumpsters in the alley off 73rd Street. (*Id.* at 9.) Habiak testified that he did not find any evidence that might have been useful in this case in the dumpsters and garbage cans around the victim's home. (*Id.*)

Tims also testified for the defense. (*Id.*) She testified that she had been employed as a licensed practical nurse at Cook County Hospital since 1986. (*Id.*) Since January 1994, Tims had lived with her three sons at 8409 South Throop. (*Id.*) Prior to January 1994, Tims had stayed with her mother for six weeks, and before that she lived at 7223 South California with her sons and a niece on the second floor of a three-flat apartment building. (*Id.*)

Tims testified that she worked the night shift in October 1993, from 11 p.m. to 7 a.m., at Cook County Hospital, leaving her children with her niece while she worked. (*Id.*) Tims was home during the daytime hours on October 5, 1993. (*Id.*) Tims testified that Petitioner would use the front door to go outside to play: the back door was kept locked. (*Id.*) Petitioner did not have a key to their apartment in October 1993, so Tims said that she always knew when he came home because she would open the front door to let him in. (*Id.*) Tims testified that Petitioner did not come home with bloody clothing in October 1993. (*Id.* at 9-10.) She acknowledged, however, that she did not always know where Petitioner was, and that it was possible he could enter the apartment without her knowledge if the front door were left open. (*Id.*)

Tims testified that on September 1, 1994, the police contacted her and asked permission to take Petitioner to the police station to look at some pictures concerning the murder. (*Id.* at 10.) That evening, the police returned Petitioner to his aunt's house, where Tims was waiting for him. (*Id.*) The following day, the police returned to Petitioner's aunt's house to take Petitioner to the

station again so that the Assistant State's Attorney could ask him some questions.[9] (*Id.*) Tims explained that the police told her that they suspected someone else and gave no indication that Petitioner was a suspect. (*Id.*) Later that day, Cassidy called and asked her to come to the station at about 5:30 or 6 p.m. (*Id.*)

Tims testified that when she arrived at the station shortly after Cassidy's call, he told her that her son had confessed to the murder. (*Id.*) Tims went into the interview room and found Petitioner crying and upset. (*Id.*) Tims recalled that while she talked with her son, the A.S.A. and Cassidy were present. She did not remember whether a youth officer was present. (*Id.*) Cassidy told Petitioner to tell his mother what he had told them earlier, and Petitioner replied, "I told them I murdered her, but I didn't do it." (*Id.*) According to Tims, Cassidy again said, "Tell your mother what you told us." (*Id.*) Petitioner again responded, "I said I murdered her, but I didn't do it." (*Id.*) Tims testified that she asked her son why he said he killed the victim if he did not do it, and Petitioner explained that he felt threatened and scared because the officers were cursing and yelling at him and slapping their knees. (*Id.*) The A.S.A. denied cursing at Petitioner, and Petitioner said, "I'm not talking about you. I'm talking about Detective Cassidy." (*Id.*)

Tims testified that the A.S.A. told her and her son that they would make it "easier" for themselves if they would sign a written statement that Petitioner did commit the murder. (*Id.*) Tims refused and called her brother. (*Id.* at 11.) Tims testified that she stayed at the police station with her son until midnight. (*Id.*) She claims that Petitioner never told her that he killed Anna Gilvis, instead insisting that his statements to the police that he did kill her were false. (*Id.*)

Tims also testified at trial that she knew Coleman from the neighborhood and that he had never stolen money from her. (*Id.*) To her knowledge, her son did not hate Coleman. (*Id.*) She

---

[9]     It is not clear from the record whether Tims testified that the police actually told her that they were taking Petitioner to the station so that he could meet with the A.S.A., or whether this statement was made in retrospect, based on the knowledge that Petitioner did in fact speak to an A.S.A. when he was at the station.

acknowledged that Petitioner had told her that the victim had called him a nigger more than once, but observed that Petitioner never told her that he intended to kill the victim. (*Id.*) Nor had Petitioner told Tims prior to September 1, 1994 that he saw Coleman kill the victim. (*Id.*)

Petitioner himself also testified at the trial. He testified that in October 1993, he lived at 7223 South California, the building next door to the victim. (*Id.*) On October 5, 1993, Petitioner went to school at 8:30 a.m. and left school at 2:30 p.m. (*Id.*) On his way home, a friend told him that something happened to the victim, and Petitioner ran home. (*Id.*) Petitioner testified that he had never been inside the victim's home and that he did not kill her. (*Id.*) Petitioner testified that after he got home that day, he talked with Detective Cassidy and told him that he saw a man come through the back gate. (*Id.*) He admitted that this statement was a lie.[10] (*Id.*)

Petitioner testified that he was at home on September 1, 1994 when Cassidy and his partner came to talk to him. (*Id.*) Petitioner stated that the police brought him food from McDonald's and asked him to look at some photographs to help his memory. (*Id.*) Petitioner did not recognize anyone from the pictures. (*Id.*) Petitioner testified that he told the police he overheard Coleman tell two black men to go into the victim's house and rob her. (*Id.*) Again, he acknowledged this was a lie and testified that he did not know why he lied about Coleman. (*Id.* at 11-12.)

Petitioner was outside his aunt's house playing basketball on September 2, 1994 when the police arrived to take him back to the police station for more questioning. (*Id.* at 12.) When he was at the police station, Cassidy told Petitioner to tell the truth, and his partner told him that Coleman had denied involvement in the murder. (*Id.*) Petitioner testified that he then told the police that he had been a lookout for Coleman, but also testified that he did not remember telling the police that

---

[10]     It is not clear from the Appellate Court's opinion whether the attorneys questioning Petitioner at trial ever tried to clarify that it was Habiak, rather than Cassidy, that Petitioner first spoke to, or whether Petitioner testified that he did not speak to Habiak that day, but spoke to Cassidy. This discrepancy does not appear to have been addressed.

Coleman had gone into the victim's house and stabbed her. (*Id.*) Petitioner testified that he never told the police that Coleman went into the victim's apartment with a baseball bat and killed her. (*Id.*)

Petitioner testified that, while he was in the interview room at the police station, Cassidy was very close to his face and cursing and yelling at him to tell the truth. (*Id.*) He claimed that Cassidy's partner pounded on Petitioner's knees and told him that the police found Petitioner's fingerprints on the murder weapon. (*Id.*) Petitioner testified that Cassidy's partner told him to tell the police that he had killed the victim, and that if he confessed, God would forgive him, the police would forgive him, and he could go home in time for his brother's birthday party. (*Id.*) Petitioner acknowledged that he did tell the police that he killed the victim, but he did not recall telling them that he hit her with her cane. (*Id.*) Petitioner remembered telling the police that after he hit the victim, she fell on the kitchen floor and dragged herself into the bathroom. (*Id.*) He told the police that he pushed the bathroom door open, hit her with her cane, tied her up on the bathroom floor, went into the kitchen, got a knife, went back to the bathroom and stabbed the victim in the throat. (*Id.* at 12-13.) Petitioner further told the police that he left the victim's apartment after the assault, changed his clothes, and threw his bloody clothes into a dumpster. (*Id.*)

Petitioner testified that after he made this statement, Cassidy left the room. (*Id.*) Petitioner asked when he could go home and the police told him that they were calling a youth officer and getting a warrant for his arrest. (*Id.*) Petitioner said that the police called his mother and then read him his rights. (*Id.*) Petitioner said that Cassidy reentered the interview room with someone, and Petitioner repeated the same version of events he had just described. (*Id.*) Petitioner admitted that no one yelled at him during this last account. (*Id.*)

Petitioner insisted that he never adopted his confession in his mother's presence, and that his statements to Cassidy that he did kill the victim were untrue. (*Id.*) Petitioner acknowledged that he did not like the victim, but testified he did not hate her either. (*Id.*) Petitioner also said that he

12

implicated Coleman because he did not like him, and at first did not think Coleman would be arrested based on his statement. (*Id.*)

Detective Edward Winstead testified in rebuttal that he was present when Petitioner told his mother that he hated Anna Gilvis and that he killed her. (*Id.*) According to Winstead, Tims responded "No, you did not do it," and Petitioner again repeated that he did. (*Id.*) Winstead did not make a report about this exchange between Petitioner and Tims. (*Id.*)

The defense called A.S.A. Klaczynski in surrebuttal. Klaczynski testified that Winstead was in fact present when Petitioner and his mother were talking to each other outside the interview room, but Winstead never told Klaczynski that he overheard any conversation between Petitioner and his mother. (*Id.* at 13-14.)

The trial judge reviewed the evidence and found Petitioner delinquent of first-degree murder and sentenced him to five years probation.

On appeal to the Illinois Appellate Court, Petitioner argued: (1) he was not proven delinquent of first-degree murder beyond a reasonable doubt; (2) his conviction must be reversed because the juvenile court did not hold a hearing *sua sponte* to determine if his confession was voluntary; and (3) he was denied his Sixth Amendment right to the effective assistance of counsel. (*Id.* at 1; Appellant's Brief in *In Re: A.M.* in the Illinois Appellate Court (hereinafter, "Petitioner's Appellate Brief"), Exhibit B to Respondent's Answer, at 1).

**Appellate Court's Findings Regarding Ineffective Assistance**

Petitioner charged that his trial counsel was ineffective in two respects: (1) counsel failed to move to suppress Petitioner's inculpatory statements, obtained by police in violation of his Fifth Amendment rights and made involuntarily without the benefit of *Miranda* warnings; and (2) counsel failed to move to quash Petitioner's illegal arrest and to suppress all statements that were the fruit of that arrest. (Petitioner's Appellate Brief, at 57.) The Appellate Court dismissed these claims.

(Ill. App. Ct. Order, at 19, Exhibit A to Respondent's Answer.) With respect to the first allegation, the Appellate Court concluded that a motion to suppress would have been futile because the evidence showed that the police considered Petitioner a witness for whom there was no requirement that *Miranda* warnings be given. (Ill. App. Ct. Order, at 19, Exhibit A to Respondent's Answer.) On Petitioner's second ineffective assistance claim, the Appellate Court determined that a motion to quash the arrest would also have been futile because, under the court's view of the evidence, Petitioner was not under arrest, and no reasonable person in Petitioner's position would have believed he was. (Ill. App. Ct. Order, at 20, Exhibit A to Respondent's Answer.)

For the foregoing reasons, the Appellate Court affirmed the trial court's decision adjudicating Petitioner delinquent of first degree murder on December 12, 1996.[11] After the Appellate Court denied his petition for a rehearing on May 29, 1997, and the Illinois Supreme Court denied leave to appeal on October 1, 1997, Petitioner filed this action on September 9, 1998, raising the five claims described earlier: (1) that he was illegally detained; (2) that the police coerced his confession; (3) that his counsel was ineffective for failing to move to suppress; (4) that counsel was ineffective for failing to move to quash the arrest and (5) that the evidence was insufficient. (Petitioner's Memorandum of Law in Support of Petition for Writ of Habeas Corpus (hereinafter, "Petitioner's Memorandum"), at 15-33.) This court held a series of evidentiary

---

[11]     Justice Wolfson dissented. In a strongly worded dissent, Justice Wolfson noted that the State's case rested almost exclusively on Petitioner's varying statements given under circumstances his defense counsel questioned in opening argument by using such words as "pressure," "duress" and "say something not true." Observing that no motion to suppress was filed, and that the trial judge did not consider holding a separate hearing on the admissibility of Petitioner's statements, the dissent concluded that such a separate hearing was necessary. Justice Wolfson's dissent questioned the trial court's failure to consider whether *Miranda* warnings were timely given, whether it was significant that Petitioner's mother was not notified that he had become a prime suspect, whether the confession was coerced, and whether he was being detained lawfully at the time of either his first or second incriminating statement. The dissent noted that the Appellate Court had, in other cases, been very careful to assess the circumstances of a minor's detention and subsequent confession. Finally, the dissent concluded that the delinquency finding should have been vacated and that the case should have been remanded for a proper hearing on the voluntariness of Petitioner's statements.

hearings over several days regarding the circumstances surrounding Petitioner's confession. Some evidence adduced at that hearing will be incorporated in the following discussion to the extent it is relevant.

## DISCUSSION

### Standards of Review

Section 2254 of the Anti-Terrorism and Effective Death Penalty Act entitles a prisoner to a writ of habeas corpus if he is being held pursuant to a state court judgment obtained in violation of the Constitution. 28 U.S.C. §§ 2254; *Williams v. Taylor,* 529 U.S. 362, 375 (2000); *Lowery v. Anderson,* 225 F.3d 833, 838 (7th Cir. 2000). With respect to any claim that was adjudicated on the merits in state court proceedings, a federal court will not grant a writ of habeas corpus unless that state decision (1) was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. §§ 2254(d)(1) & (2); *Winters v. Miller,* 274 F.3d 1161, 1165 (7th Cir. 2001); *Hough v. Anderson,* 272 F.3d 878, 889 (7th Cir. 2001). Furthermore, this court will not address the merits of a habeas corpus petition unless the petitioner can show that he has exhausted his state remedies and avoided procedural default. *U.S. ex rel. Bell v. Pierson,* 267 F.3d 544, 551 (7th Cir. 2001).

### Ineffective Assistance of Counsel [12]

Petitioner claims that he was denied the effective assistance of counsel in violation of his Sixth Amendment rights because his trial counsel: (1) failed to move to suppress involuntary statements obtained by police in violation of his Fifth Amendment rights, and (2) failed to move to

---

[12] Because Petitioner's ineffective assistance claims warrant habeas relief, the court will address only those claims without expressing an opinion on the viability of the other claims raised in the petition.

quash Petitioner's illegal arrest in violation of the Fourth Amendment and to suppress all statements that were the fruit of that arrest. (Petitioner's Memorandum, at 27.) Respondent acknowledges that Petitioner fairly presented this claim to the state courts and avoided procedural default, but argues that Petitioner failed to show that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." (Respondent's Answer, at 13).

To prevail on an ineffective assistance claim, Petitioner must demonstrate: (1) that his trial counsel's performance "fell below an objective standard of reasonableness," and (2) that this deficient performance prejudiced the defense to the extent that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). With respect to the first *Strickland* prong, Petitioner bears the burden of overcoming the "strong presumption that counsel's performance falls within the 'wide range of professional assistance.'" *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986), quoting *United States v. Cronic*, 466 U.S. 648, 689 (1984). This court must evaluate trial counsel's representation "from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of review is highly deferential." *Kimmelman*, 477 U.S. at 381.

Petitioner raised these ineffective assistance claims with the Illinois Appellate Court. That court rejected both claims because it concluded that pursuing the motion to suppress and the motion to quash would have been futile, and therefore, Petitioner's trial counsel could not have been ineffective for failing to file those motions. This court must determine whether the Appellate Court's conclusion was contrary to or an unreasonable application of Federal law.

**Merits of the underlying arguments**

Petitioner urges that effective trial counsel would have moved to quash his arrest and

suppress his statements. He urges that his confession was obtained in violation of his Fifth Amendment rights, because his first inculpatory statement was obtained in the course of a custodial interrogation prior to any warnings, and because both inculpatory statements were involuntary. Petitioner further argues that his confession was the product of an illegal arrest in violation of his Fourth Amendment rights. The Appellate Court concluded that such arguments would have been futile. The court will consider, in turn, the Appellate Court's conclusions with respect to whether Petitioner was in custody, whether Petitioner was under arrest, and whether his statements were voluntary.

**Custody**

The failure to administer *Miranda* warnings in a custodial interrogation "creates a presumption of compulsion" with respect to statements made during the interrogation, which must, as a result, be excluded from evidence. *Oregon v. Elstad*, 470 U.S. 298, 307 (1985). The Appellate Court rejected Petitioner's contention that he was in custody because it concluded based on factors identified by the Illinois Supreme Court in *People v. Brown*, that Petitioner was not subject to a custodial interrogation, but was merely considered a witness. (Ill. App. Ct. Order, at 19, Exhibit A to Respondent's Answer.) The *Brown* factors relevant to whether an interrogation is custodial are: "the location, length, mood and mode of the interrogation; the number of police officers present; any indicia of formal arrest or evidence of restraint; the intentions of the officers; and the extent of knowledge of the officers and the focus of their investigation." *People v. Brown*, 136 Ill. 2d 116, 124-25, 554 N.E.2d 216, 220 (1990). Upon considering these factors, the trial court is to "make an objective determination as to what a reasonable man, innocent of any crime, would perceive if he were in defendant's position." *Id.* at 125, 554 N.E.2d at 220.

Significantly, Supreme Court precedent is clear that courts are not allowed to give any weight to the uncommunicated intentions or subjective views of the investigating police officer in

determining whether an individual is in custody for *Miranda* purposes. *Stansbury v. California*, 511 U.S. 318, 323-24 (1994). The Court explains that where a police officer questions an individual he considers a suspect, but does not communicate this suspicion to the suspect, the officer's subjective belief has no bearing on the "'only relevant inquiry,'" namely, "'how a reasonable man in the suspect's position would have understood his situation.'" *Id.* at 324, quoting *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984). In other words, an officer's knowledge or beliefs are "relevant only to the extent they would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her 'freedom of action.'" *Stansbury*, 511 U.S. at 325, quoting *Berkemer*, 468 U.S. at 440; *cf. United States v. James,* 113 F.3d 721, 727-28 (7th Cir. 1997) (where investigators' views evolved during course of interview from considering individual a witness to considering him a suspect, these views are irrelevant because investigators did not communicate these suspicions to him). Indeed, even where a police officer does not consider an individual a suspect, but merely a witness, that individual might still be in custody and entitled to *Miranda* warnings. *Stansbury*, 511 U.S. at 324.

The Appellate Court's application in this case of the factors identified by the Illinois Supreme Court thus conflicts with Supreme Court precedent: neither the intentions of the officers, the extent of their knowledge, nor the focus of their investigation are relevant unless communicated to the individual whose custody is at issue. This conflict is crucial here because, as the following excerpt shows, the Illinois Appellate Court relied heavily upon the officer's perceptions in determining that Petitioner was not in custody:

> The factors surrounding [Petitioner's] interrogation only lead to the conclusion that *he was considered as a witness.* He was treated well and returned home the first day. The second day he agreed to return to the police station alone and he spoke with the same officers. He was not handcuffed, photographed, or fingerprinted. Under the circumstances of [Petitioner's] visit to the station, a reasonable, innocent person would not believe he were under arrest.
> Detective Cassidy testified that [Petitioner's] demeanor changed right before he made his confession. He 'busted out crying, his eyes got large, he started shaking, and his chest was heaving upward.' His confession followed this change

> in behavior, and *Detective Cassidy testified that he was stunned and could not speak. The detective's reaction to [Petitioner's] confession showed that he was considered a witness up to that point.* Thus, under the factors in Brown, [Petitioner] did not face a custodial interrogation.

(Ill. App. Ct. Order, at 19, Exhibit A to Respondent's Answer) (emphasis supplied). This excerpt is the entire Appellate Court discussion of whether Petitioner was in custody for *Miranda* purposes. The excerpt reflects the court's substantial reliance on Detective Cassidy's perception of whether Petitioner was a witness or a suspect, a factor the U.S. Supreme Court has concluded is entitled to no weight. The focus of the Appellate Court's description of Cassidy's testimony is on Cassidy's reaction to Petitioner's behavior, and how this reaction revealed that Cassidy believed Petitioner was merely a witness not in need of *Miranda* warnings. Again, under Supreme Court precedent, the Illinois Appellate Court should not have given this factor any weight without evidence that this belief had been made manifest to Petitioner. *Stansbury*, 511 U.S. at 325.

The Appellate Court did note that Petitioner "agreed" to return to the station alone on the second day, and that he was not handcuffed, photographed or fingerprinted. The relevance and accuracy of the Appellate Court's conclusion that Petitioner "agreed to return to the police station alone" the second day is, at a minimum, open to question. The uncontradicted evidence at trial was that the police came to Petitioner's aunt's house where he was playing basketball and that his mother told him to go with the officer to the station to answer some questions. Petitioner, a young boy unable to return to the police station on his own, was driven there by the officer and led to an interview room. Though he may not have put up a fight, and therefore "agreed," these circumstances hardly support the conclusion that Petitioner was free to leave the police station. In fact, Detective Cassidy testified that he would not have allowed Petitioner to leave if he had tried. (Evidentiary Tr., at 270.) While the fact that Petitioner was not handcuffed, photographed, or fingerprinted properly goes to the weight under *Brown* of the "indicia of formal arrest or evidence of restraint," it does not offset the other factors indicating that Petitioner was in custody.

In this court's view, the Illinois Appellate Court all but ignored the most important factors: those probative of what a reasonable person in Petitioner's position would have perceived. *Stansbury*, 511 U.S. at 325. Even under *Brown*, the Appellate Court should have considered the location, length, mood and mode of the interrogation, as well as the number of police officers involved. 136 Ill. 2d at 124, 554 N.E.2d at 220. The Appellate Court's analysis leaves many of these factors unaddressed, but this court will review them briefly here.

First, the setting: the interrogation took place in an interview room at the police station with two officers present. As the Illinois Supreme Court noted in *Brown*, such a setting was a major concern for the Court in *Miranda*: "The Court in *Miranda* was concerned with interrogations that take place in a police-dominated environment containing 'inherently compelling pressures which work to undermine the individual's will to resist and compel him to speak where he would not otherwise do so freely.'" *Brown*, 136 Ill. 2d at 124, 554 N.E.2d at 220, quoting *Miranda*, 384 U.S. at 467. Second, the length of the interrogation: officers interviewed Petitioner for about an hour and a half in this "police-dominated environment" before he made his first inculpatory statement. Regarding the mood and mode of the interrogation, there is some conflicting evidence on the subject, with Petitioner insisting that the detectives were leaning closely in towards him and slapping their knees while they spoke, promising him that both God and the police would forgive him for what he did, and assuring him that he could go home to his brother's birthday party if he told them what happened. (Ill. App. Ct. Order, at 12, Exhibit A to Respondent's Answer.) Respondent denies these activities, but does acknowledge that during the interview Cassidy was seated near enough to touch Petitioner and that he told him at various times in the interview that he did not believe him or that what he was saying did not make sense.

Under either set of facts, this was an eleven-year-old boy with no prior experience with the police interrogated at length by two detectives in an interview room at the police station without a parent or attorney present. Petitioner was not told he was free to go at any time, nor did he have

any known means of getting home if he did want to leave. Cassidy himself acknowledged that if Petitioner had wanted to leave, Cassidy would not have let him go. (Transcript of Evidentiary Hearing (hereinafter, "Evidentiary Tr."), at 270.) All of the factors bearing on whether a reasonable person in Petitioner's situation would consider his freedom to have been curtailed weigh heavily in favor of a finding that Petitioner was in custody and should have been apprised of his *Miranda* rights. The Illinois Appellate Court erred when it held otherwise. Because its analysis focused on factors the Supreme Court directs it not to consider, the Appellate Court's decision was contrary to Supreme Court precedent.

**Arrest**

Much like his argument that he was in custody, Petitioner argues that he was illegally seized and placed under arrest in violation of his Fourth Amendment rights when the detectives took him to the police station to interrogate him. The police violate an individual's Fourth Amendment rights when they seize a person without probable cause to believe that person has committed a crime. *Dunaway v. New York,* 442 U.S. 200, 206-07 (1979). In *Dunaway,* acting without probable cause on a tip from an informant, three detectives located petitioner at a neighbor's house and drove him to the police station where he was placed in an interrogation room, read his *Miranda* rights, and questioned. *Id.* at 203. Although petitioner was not told that he was under arrest, if he had tried to leave he would have been stopped. *Id.* Respondent insisted that the seizure did not amount to an arrest in violation of the Fourth Amendment because the police had a "'reasonable suspicion' that petitioner possessed 'intimate knowledge about a serious unsolved crime.'" *Id.* at 207.

The Supreme Court disagreed with respondent, observing that this "detention . . . was in important respects indistinguishable from a traditional arrest." In a discussion of facts that closely parallel the facts of the instant case, the Supreme Court noted:

> Petitioner was not questioned briefly where he was found. Instead, he was
> taken from a neighbor's home to a police car, transported to a police station, and

placed in an interrogation room. He was never informed that he was "free to go"; indeed, he would have been physically restrained if he had refused to accompany the officers or had tried to escape their custody.

*Id.* at 212. The Court further highlighted that "the mere facts that petitioner was not told he was under arrest, was not 'booked,' and would not have had an arrest record if the interrogation had proved fruitless," did not change the fact that this detention was sufficiently intrusive to constitute an arrest under the Fourth Amendment. *Id.* at 212-13. Emphasizing that its own precedents "reflect the conclusion that detention for custodial interrogation – regardless of its label – intrudes so severely on interests protected by the Fourth Amendment as necessarily to trigger the traditional safeguards against illegal arrest," the Supreme Court found that the police in that case had violated the Fourth and Fourteenth Amendments when they took petitioner to the police station to interrogate him without probable cause. *Id.* at 216.

It is undisputed in this record that the police did not have probable cause to believe Petitioner had committed a crime when they took him to the police station. In fact, the only notable differences between *Dunaway* and the instant case, are (a) that here, the police seized a juvenile, while in *Dunaway* the police seized an adult, and (b) here, Petitioner was not read his *Miranda* rights until after he confessed, while in *Dunaway*, the petitioner was given *Miranda* warnings upon arrival at the police station. Far from providing a meaningful basis to distinguish the present case, these differences only highlight Petitioner's vulnerability.

In reaching its conclusion that a motion to quash would have been futile, the Illinois Appellate Court correctly summarized the *Dunaway* holding that "the fourth amendment [*sic*] is violated where a person is 'seized' and then questioned while in custody on less than probable cause." (Ill. App. Ct. Order, at 20, Exhibit A to Respondent's Answer, citing *Dunaway*, 442 U.S. at 207.) The court made no comment, however, on the near-factual identity of this case to *Dunaway*. Nor did it provide any reasoning to justify its conclusion that *Dunaway* does not control the outcome here. This court concludes that *Dunaway* squarely governs this case and that the

Appellate Court's decision to the contrary was unreasonable.

As noted earlier, the Appellate Court also correctly identified a number of factors relevant to whether a person is under arrest: "the place, time, length, mood, and mode of interrogation, the number of police officers present, whether the accused felt like he could leave, the presence or absence of the accused's friends or family, the age, intelligence, and mental makeup of the accused, and the extent of the knowledge of the police officers and the focus of their investigation." (Ill. App. Ct. Order, at 20, Exhibit A to Respondent's Answer, citing *People v. Matthews*, 205 Ill. App. 3d 371, 402-03, 562 N.E.2d 1113, 1131-32 (1st Dist. 1990).) But, as described above, the Appellate Court all but ignored those when it considered whether Petitioner was under arrest. As it did in its analysis of the custody issue, the court observed that Petitioner was only considered a witness, that he was not told that he could not leave, and that the police had always focused on adult suspects. (Ill. App. Ct., at 20, Exhibit A to Respondent's Answer.) It concluded that a reasonable person in Petitioner's position would not have believed he was under arrest. (*Id.*) In reaching that conclusion, the court made no mention of the bulk of the relevant factors: the place, time, length, mood, and mode of the interrogation, the number of police officers present, whether Petitioner felt free to leave, the presence or absence of Petitioner's friends or family, and the Petitioner's age, intelligence, and mental makeup. For the reasons discussed in the above custody analysis, these factors all indicate that Petitioner was seized within the meaning of the Fourth Amendment and that his confession was the product of an illegal arrest. This conclusion bolsters the result mandated by *Dunaway*. Again, this court concludes that the Illinois Appellate Court's determination is inconsistent with Supreme Court precedent.

**Voluntariness**

Petitioner also maintains that his trial counsel should have argued that his confession was involuntary and that he did not knowingly and intelligently waive his *Miranda* rights. The Supreme

Court direction on this issue is clear: A trial court must evaluate the voluntariness of a confession, particularly the confession of a juvenile, with great care. In *Jackson v. Dunno*, 378 U.S. 368 (1964), cited by Petitioner, the Court instructed that the procedures used in a trial court to determine whether a confession was coerced must "be fully adequate to insure a reliable and clear-cut determination of the voluntariness of the confession, including the resolution of disputed facts upon which the voluntariness issue may depend." *Id.* at 391. The *Jackson* Court characterized assessment of a confession as an "exceedingly sensitive task, one that requires facing the issue squarely, in illuminating isolation and unbeclouded by other issues. . . ." *Id.* at 390. In confronting this "exceedingly sensitive task," courts must "assess[ ] the totality of all the surrounding circumstances − both the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). Such an assessment requires "evaluation of the juvenile's age, experience, education, background, and intelligence, and . . . whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." *Fare v. Michael C.*, 442 U.S. 707, 725 (1979). Additional factors the Supreme Court has looked to in evaluating the voluntariness of a juvenile's confession include his prior experience with the criminal justice system, whether the questioning was repeated or prolonged and the presence or absence of a parent, attorney, or other friendly adult during the interrogation. *Schneckloth*, 412 U.S. at 226; *Gallegos v. State of Colorado*, 370 U.S. 49, 54-55 (1962); *Fare*, 442 U.S. at 725-26.

The Supreme Court has been particularly sensitive to the vulnerable position of a young person under questioning by police officers. For example, the Supreme Court rejected the confession of a 15-year-old boy who was interrogated for five hours starting at midnight without the presence of a parent or attorney:

> What transpired would make us pause for careful inquiry if a mature man were involved. And when, as here, a mere child − an easy victim of the law − is before us, special care in scrutinizing the record must be used. Age 15 is a tender

and difficult age for a boy of any race. He cannot be judged by the more exacting standards of maturity. . . . A 15-year old lad questioned through the night by relays of police, is a ready victim of the inquisition. . . . But we cannot believe that a lad of tender years is a match for the police in such a contest. He needs counsel and support if he is not to become the victim first of fear, then of panic. He needs someone on whom to lean lest the overpowering presence of the law, as he knows it, may not crush him.

*Haley v. State of Ohio*, 332 U.S. 596, 599-600 (1948). The *Haley* Court was unmoved by the prosecution's contention that petitioner had knowingly waived his constitutional rights:

That assumes, however, that a boy of fifteen, without aid of counsel, would have a full appreciation of that advice and that on the facts of this record he had a freedom of choice. We cannot indulge those assumptions. Moreover, we cannot give any weight to recitals which merely formalize constitutional requirements. Formulas of respect for constitutional safeguards cannot prevail over the facts of life which contradict them.

*Id.* at 601.

Later, in *Gallegos*, 370 U.S. at 54-55, the Supreme Court reversed a conviction based on the confession of a 14-year-old. The boy in that case had been advised of his right to counsel, but did not ask for a lawyer or his parents. Nevertheless, the Court observed:

[A]14-year-old boy, no matter how sophisticated, is unlikely to have any conception of what will confront him when he is made accessible only to the police. That is to say, we deal with a person who is not equal to the police in knowledge and understanding of the consequences of the questions and answers being recorded and who is unable to know how to protest his own interests or how to get the benefits of his constitutional rights. . . . A lawyer or an adult relative or friend could have given the petitioner the protection which his own immaturity could not.

A review of the totality of the circumstances surrounding Petitioner's statements generates serious concern that the constitutional principles announced by the Supreme Court above were not regarded with due respect in this case. Consider Petitioner's age: he was eleven years old when he made these incriminating statements. In case after case, courts have concluded that juveniles years older than Petitioner were overwhelmed by the pressures of police questioning, and coerced into making an involuntary confession. *Haley*, 332 U.S. at 599 (fifteen years old); *Gallegos*, 370 U.S. at 54 (fourteen years old); *In re Gault*, 387 U.S. 1, 46 (1967) (fifteen years old); *Woods v.*

*Clusen*, 794 F.2d 293, 298 (7th Cir. 1986) (sixteen and one-half years old); *United States v. Hardaway*, 162 F. Supp. 2d 1005, 1008 (N.D. Ill. 2001) (fourteen years old); *People v. Griffin*, 327 Ill. App. 3d 538, 540, 763 N.E.2d 880, 882 (4th Dist. 2002) (fifteen years old); *People v. McDaniel*, 326 Ill. App. 3d 771, 762 N.E.2d 1086, 1095 (1st Dist. 2001) (fourteen years old). Significant too is Petitioner's total lack of prior experience with the criminal justice system; nothing in the record nor in his demeanor years later in the evidentiary hearing suggests that he would have been better-suited to understand and knowingly exercise his rights than would any other eleven-year-old. (Petitioner's Memorandum, at 26.)

The circumstances of the interview on September 2, 1994 did nothing to mitigate the disadvantage of Petitioner's youth. The police told Petitioner's mother that, in light of the information Petitioner had provided the previous day, they wanted Petitioner to speak to an assistant state's attorney so that they could charge Nolan Coleman. (Evidentiary Tr., at 266-68.) Petitioner's mother asked whether she could or should accompany her son to the police station, but the police replied that that would not be necessary. (*Id.* at 64.) Detective Cassidy testified that when he questions a minor, he prefers not to have a parent present in the room because he believes the parent's presence will make the minor less willing to talk. (*Id.* at 343, 407-08.) The policy of both the Chicago Police Department, and the Cook County State's Attorney's office is at odds with Cassidy's approach: These offices' expressed policy is to attempt in every case to have a parent present for the questioning of a minor, and where a parent is not available, to have a youth officer present. (*Id.* at 128, 353-54.)     In the initial stages of the interview at issue here, no youth officer was present, nor was any adult interested in Petitioner's welfare. (*Id.* at 271.)

Petitioner was taken to an interview room where he was alone with Detectives Cassidy and Schmidt. (*Id.* at 271.) The two detectives sat directly across from Petitioner, without a table between them, so that the detectives were close enough to touch him. (*Id.* at 304-06.) Although Petitioner initially repeated the same story he had given the day before, implicating Coleman, the

detectives did not take him to speak to the Assistant State's Attorney. (*Id.* at 273.) Instead, Cassidy confronted Petitioner with Coleman's denial of any participation in the murder. (*Id.* at 274.) Petitioner proceeded to give two additional, different versions of the story; each time Cassidy told Petitioner that he did not believe him or thought he was lying, prompting Petitioner to give another version of the events. (*Id.* at 287, 291.) Eventually, Petitioner related a fourth version of the events of the murder in which he admitted to the killing. (*Id.* at 67.) Cassidy did not press Petitioner further once he confessed. (*Id.* at 296.)

Although Cassidy testified that the police tried to get in touch with Petitioner's mother at this time, Cassidy, A.S.A. Klaczynski, and each of the other detectives who testified at the hearing testified that they themselves did not call Petitioner's mother, but thought someone else had done so. (*Id.* at 128, 297, 417.) Without speaking to Petitioner's mother, Cassidy, Youth Officer Corey, and A.S.A. Klaczynski joined Petitioner in the interrogation room and shortly after 5:00 p.m., A.S.A. Klaczynski read Petitioner his *Miranda* rights for the first time. (*Id.* at 299.) A.S.A. Klaczynski testified that, although he usually reads a version of the *Miranda* rights tailored to juveniles for a young suspect, he did not recall having done so in this case. (*Id.* at 131.) Cassidy testified that Petitioner was read the standard "adult" version. (*Id.* at 299.) A.S.A. Klaczynski testified that when he asked Petitioner if he understood his rights, Petitioner simply replied "Yes." (*Id.* at 131.) Petitioner later testified, at the evidentiary hearing held by this court, that he thought the right to remain silent meant "be quiet." (*Id.* at 72.) Youth Officer Corey did not attempt to make sure that Petitioner understood his rights. Indeed, the only thing Youth Officer Corey said to Petitioner was that he could get ten years in prison for murder. (*Id.* at 76.) Petitioner proceeded to recount the same story he had just told Cassidy, implicating himself.

This interrogation took place at the police station, a location "well understood" to be "inherently coercive" for the purposes of an interrogation, particularly where a minor is involved. *In Interest of J.W.*, 274 Ill. App. 3d 951, 960, 654 N.E.2d 517, 523 (1st Dist. 1995). Neither a

parent, youth officer, nor any concerned adult was with Petitioner when he made his first statement. Nor can the court find on this record that Petitioner had the benefit of a concerned adult when he made the second inculpatory statement. There is no evidence that Youth Officer Corey took any specific action to advance or protect Petitioner's rights or interests; the court is unable to conclude that he acted as a concerned adult, or that his presence offset the absence of Petitioner's mother. *See McDaniel*, 326 Ill. App. 3d at 785, 762 N.E.2d at 1097 (where youth officer never spoke with juvenile defendant and made no comments during the interrogation, presence of youth officer did not protect juvenile defendant's welfare).

Furthermore, the court finds that the *Miranda* warning given here was, under the circumstances of this case, ineffective as a safeguard of Petitioner's constitutional rights. Before that warning was made, Petitioner had already been questioned for about an hour and a half by two detectives behind closed doors in a police station. He had become very upset, was crying, and had told four different versions of the Gilvis murder. At least one of those versions of the "truth" drew criticism from Cassidy, who warned Petitioner that Coleman, a person Petitioner may well fear, had denied wrongdoing. Finally, only after describing three different scenarios did Petitioner implicate himself. Next, Petitioner was left alone, crying for a few minutes before Cassidy returned with Youth Officer Corey (who, so far as the court is aware, did nothing to counsel or help Petitioner), and A.S.A. Klaczynski, who read him his *Miranda* rights (a version not appropriate for juveniles).

The court believes public policy supports the practice of A.S.A. Klaczynski and other law enforcement officers to read young suspects a version of *Miranda* customized for juveniles. Individuals, old and young alike, may waive their *Miranda* rights only where the purported waiver was knowing and intelligent. *Miranda*, 384 U.S. at 479. Where a police interrogation proceeds without the presence of an attorney and the police obtain a statement, "a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege

against self-incrimination and his right to retained or appointed counsel." *Miranda*, 384 U.S. at 475. The challenge to show that a waiver was knowing and intelligent is heightened where a juvenile is involved: children do not have the same mental capacity as adults, either to understand the nature of their rights, or to understand what it means to waive them.

When reviewing the interrogation of a juvenile to determine whether he knowingly and intelligently waived his *Miranda* rights, courts again use the totality of the circumstances approach, which, for these purposes, "includes evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." *Fare,* 442 U.S. at 725. The government did not meet its burden in this case. Again, Petitioner was eleven years old and had no prior experience with the police. There is no reason to believe this eleven-year-old had capacity beyond his years to understand the inherently abstract concept of Constitutional rights, or what it means to waive them. Law enforcement officers recognize the value of tailoring *Miranda* warnings to juveniles; yet, for reasons they have not explained, A.S.A. Klaczynski and Detective Cassidy declined to treat Petitioner as they had treated children in other cases. Rather, they treated him as an adult. Neither Youth Officer Corey nor the others asked any follow-up questions to determine that Petitioner comprehended his rights, nor did they break down the warning or explain it any differently than they would have to an adult. Under the circumstances of this case, this court finds that Petitioner's statements were not voluntarily given, and he did not knowingly and intelligently waive his *Miranda* rights.

In this court's view, the Illinois courts failed to address the totality of these circumstances. The trial court made no explicit findings with respect to the voluntariness of Petitioner's confession at all. The Appellate Court, in turn, assumed that the trial court must have considered the evidence surrounding Petitioner's confession, and further assumed that the trial court must have determined that it was made voluntarily. That is where the Appellate Court's assessment of the voluntariness

29

of Petitioner's statements ended. Notably, the Appellate Court did not conclude that a suppression motion would have failed because Petitioner's confession was voluntary. Rather, it rested that conclusion on its decision, discussed above, that Petitioner was not in custody, and therefore, not entitled to *Miranda* warnings. As previously discussed, this court believes that conclusion was contrary to Supreme Court precedent. Similarly, to the extent the Appellate Court's assumption that the trial court had properly resolved the voluntariness issue influenced its decision that a motion to suppress Petitioner's confession would have been futile, that court unreasonably applied the Supreme Court precedent discussed above.

**Petitioner's Trial Counsel Was Ineffective**

Petitioner argues he was denied his Sixth Amendment right to the effective assistance of counsel at his trial, a "fundamental right of criminal defendants" necessary to "assure[ ] the fairness, and thus, the legitimacy of our adversary process." *Kimmelman*, 477 U.S. at 374. The legitimacy of that process requires that the accused, through counsel, has the right "to require the prosecution's case to survive the crucible of meaningful adversarial testing." *Cronic*, 466 U.S. at 656. It is assumed that this meaningful testing occurs unless a petitioner can show that his trial counsel's performance "fell below an objective standard of reasonableness," and that this deficient performance prejudiced the defense to the extent that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 687, 694.

The Illinois Appellate Court concluded that Petitioner could not meet either prong of the *Strickland* test because it concluded that motions to quash his arrest or suppress his inculpatory statements would have been futile. As discussed in the previous section, this court believes, to the contrary, that such motions would have enjoyed an enormous probability of success. This court's conclusion on the underlying claims is not by itself sufficient to show ineffective assistance.

*Kimmelman*, 477 U.S. at 382 (while a meritorious Fourth Amendment issue was necessary for respondent's Sixth Amendment claim, it was not sufficient to earn federal habeas relief). Nevertheless, although "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment," in this case that presumption is amply overcome. *Strickland*, 466 U.S. at 690.

With respect to the first *Strickland* prong, the court cannot conceive of any sound trial strategy that would countenance permitting the introduction of Petitioner's statements to go unchallenged. The prosecution's *only* evidence against Petitioner in this case was his confession.[13] That fact alone should have drawn counsel's considered attention to the challenges that could be mounted against it. Nor does the court believe the arguments to be made here were obscure or intricate. To the contrary, thoughtful counsel would readily recognize the propriety of a challenge to the admissibility of statements obtained during a custodial police interrogation of an eleven-year-old without a concerned adult present, who was not read his *Miranda* rights until he had already

---

[13]     As noted, Petitioner has argued insufficiency of the evidence as an independent basis for habeas corpus relief. In light of its disposition of his ineffective assistance claims, the court need not reach this issue, other than to note that the absence of any physical evidence tying A.M. to the crime renders the coerced confession pivotal: Even in his "confession," Petitioner denied robbing Ms. Gilvis, but the physical evidence indicated that the murderer also robbed the victim. Petitioner told Cassidy he entered the victim's apartment through an open back door, but the detectives found evidence that the lock had been "jimmied" and the door pried open. Cassidy testified that Petitioner reported he used rope from hanging plants in the victim's living room to tie up Ms. Gilvis, but there were no hanging plants in the victim's apartment, and the victim was bound with telephone cord, red cloth belts, and two handkerchiefs. The smooth, straight, uninterrupted streaks of blood stretching from the victim's kitchen to her bathroom were inconsistent with Petitioner's account that she crawled to the bathroom after he beat her with her cane, rather than being dragged there by her assailant. Further, it is unlikely that Petitioner, then 5"1" tall and 88 pounds, was capable of dragging the 173-pound, 5'5" victim across her apartment by himself. Finally, the circumstances of the murder, in which the assailant systematically bound and gagged the victim, robbed her, and then chose one of two kitchen knives before stabbing her precisely through the carotid arteries, are inconsistent with the prosecution's theory that Petitioner committed the crime in a sudden fit of rage. Police failed to recover any bloody clothing from the area, though the dumpster Petitioner said he deposited them in was only half a block from the crime scene. Finally, the only prints recovered – a bloody palm print and shoe print – were left by an adult, not by a ten-year-old boy.

made an inculpatory statement.

In *Freeman v. Lane*, petitioner argued that his appellate counsel was ineffective for failing to raise a Fifth Amendment claim regarding the prosecution's closing comments that the state's case was "uncontradicted and unrebutted." 962 F.2d 1252, 1255 (7th Cir. 1992). The Seventh Circuit concluded that the comment was a clear Fifth Amendment violation under its precedent, and even though Illinois law on the issue was unsettled, the Seventh Circuit found that there was "no reasonable strategic explanation" for forgoing this issue on appeal, especially where it was petitioner's best, and perhaps only, argument. *Id.* at 1258. Under these circumstances the court concluded, appellate counsel's performance was objectively unreasonable and deficient.

Similarly, in *People v. Bonslater*, the prosecution's entire case rested on the testimony of one police officer. 261 Ill. App. 3d 432, 434, 633 N.E.2d 830, 831-32 (1st Dist. 1994). Where petitioner's trial counsel failed to make an opening statement, cross-examine the state's only witness, or present any defense witnesses, the Illinois Appellate Court concluded that counsel did not "subject the prosecution's case to 'meaningful adversarial testing.'" (*Id.* at 440, 633 N.E.2d at 835.) It concluded that, "at a minimum, defense counsel was required to challenge the veracity of [the police officer's] statements." (*Id.*, 633 N.E.2d at 836.)

In *People v. Fernandez*, two mentally impaired defendants confessed their involvement in a crime to police. 162 Ill. App. 3d 981, 516 N.E.2d 366 (1st Dist. 1987). Although there was no evidence of coercion surrounding the confessions, the Appellate Court concluded that counsel was ineffective for failing to move to suppress the confessions because the "defendants' handicap. . . should have alerted the defense attorney to the possibility that the defendants did not understand their *Miranda* rights, and hence that their statements were conceivably involuntary." *Id.* at 988-89, 416 N.E.2d at 371. That court concluded that the failure to file the motion to suppress "was an error clearly outside the wide range of professionally competent assistance." *Id.*

This court likewise concludes that, at a minimum, Petitioner's trial counsel should have tried

32

to keep his statements out of evidence where the statements were the only evidence against him, and where there were numerous, meritorious grounds for such a motion. No reasonable trial strategy exists to justify the failure.

Regarding the second *Strickland* prong, there is no question that Petitioner was prejudiced by his trial counsel's deficient performance. As the above analysis of the underlying claims reveals, the motions to suppress the confession and to quash the arrest would have enjoyed a very high probability of success. If either of the motions had succeeded, the prosecution would have been left without any evidence linking Petitioner to Gilvis's murder.

## CONCLUSION

For the above reasons, Petitioner's petition for writ of habeas corpus is granted. Because Petitioner has already completed the sentence imposed by the trial court, the court invites the parties, on or before July 5, 2002, to submit suggestions for an appropriate remedy.

ENTER:

Dated: June 19, 2002

REBECCA R. PALLMEYER
United States District Judge